IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:

HALE-HALSELL CO.,

        Debtor.

Filed / Docketed
July 11, 2007

Case No. 04-11677-M
Chapter 11

## MEMORANDUM OPINION

In this dispute between a landlord and the tenant's guarantor, the Court is asked to determine whether environmental liability falls within the scope of a guaranty. If it does, the landlord has a claim in this bankruptcy case. If not, the quarrel ends here. The following findings of fact and conclusions of law are entered pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

This Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1408. Reference to the Court of the case is proper pursuant to 28 U.S.C. § 157(a). This contested matter is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(B).

### Findings of Fact

Hale-Halsell Company ("Hale-Halsell") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on March 22, 2004. Prior to filing bankruptcy, Hale-Halsell was in the wholesale grocery business and owned, among other interests, an 86% interest in Git-N-Go, Inc. ("Git-N-Go"), a convenience store chain located throughout Oklahoma and Missouri. Hale-Halsell and Git-N-Go are no longer in operation.

The parties to the present dispute are the Hale-Halsell Company Creditors Trust (the

"Creditors Trust") and Dale and Doris Postma (the "Postmas"). The Creditors Trust was created pursuant to the Fourth Amended Modified Plan of Liquidation (the "Plan") filed in Hale-Halsell's bankruptcy case on January 12, 2007, and confirmed on March 5, 2007. The Postmas are the owners of certain real estate located in the state of Missouri (the "Real Property"). The Real Property is located adjacent to the Cumberland Presbyterian Church (the "Church"), a house of worship.

On November 12, 1986, Git-N-Go and Norman and Josephine Hoeft (the "Hoefts") entered into a lease agreement (the "Lease Agreement") for the operation of a convenience store by Git-N-Go on the Real Property. Under the terms of the Lease Agreement, Git-N-Go agreed that it would "defend, indemnify and save Lessors harmless from and against all liabilities, obligations, losses, damages and claims, actions, suits and proceedings, charges and expenses, including reasonable attorney's fees, which may be imposed upon or incurred by or asserted against Lessors in respect of any use, non-use or condition of the Leased Premises created by Lessee or attributed to Lessee's use or manner of use of the Leased Premises[.]"[1] As part of this transaction, Hale-Halsell executed a written guarantee (the "Guarantee") of the Lease Agreement for the benefit of Git-N-Go, which was authorized by Hale-Halsell's board of directors, on November 12, 1986.[2]

Almost ten years later, on August 19, 1996, the Hoefts and Git-N-Go entered into a lease addendum (the "Lease Addendum").[3] The Lease Addendum dealt directly with the question of liability for environmental damage to the Real Property. It included a recital noting that the Lease Agreement "was silent as to Lessee's [Git-N-Go] agreement concerning environmental matters[.]"

---

[1] *Stipulation of Facts, Docket No. 2028-2*, Exh. A, ¶ 11.

[2] *Stipulation of Facts, Docket No. 2028-3*, Exh. B.

[3] *Stipulation of Facts, Docket No. 2028-4*, Exh. C.

The Lease Addendum made it clear that Git-N-Go would be responsible for the cost of clean up and repair of any environmental damage to the Real Property.  There is no evidence to indicate that Hale-Halsell executed any additional guarantee agreements for the benefit of Git-N-Go relating to the Lease Addendum, or amended the Guarantee to reference the Lease Addendum.  Sometime in late 1997 or early 1998, the Hoefts assigned the Lease Agreement to the Postmas.  Git-N-Go authorized the Hoefts' assignment of the Lease Agreement to the Postmas by written letter on October 9, 1997, in accordance with the Lease Agreement.

Git-N-Go filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on January 30, 2004.  Git-N-Go ceased operating the convenience store located on the Real Property in the summer of 2004, and formally rejected the Lease Agreement on July 9, 2004.  In April 2005, the gasoline storage tanks and distribution systems located underneath the Real Property were removed by Git-N-Go pursuant to a court-approved compromise between the Postmas and Git-N-Go.  The Real Property remains vacant.

Prior to filing bankruptcy and on a post-petition basis, Git-N-Go has employed Environmental Works, Inc. ("EWI"), to remediate environmental damages arising from gasoline contamination of the Real Property.  Although EWI has removed accessible contaminated soil from the Real Property and adjacent property; treated contaminated ground water; installed a groundwater pump and air stripping system at the Real Property; installed air ventilation equipment at the Church; and installed numerous groundwater monitoring wells on the Real Property and adjacent property, including the Church, the Postmas and the Church claim additional remediation of the Real Property is necessary.

The Postmas filed Proof of Claim No. 485 (the "Environmental Claim") in Hale-Halsell's

bankruptcy case on August 25, 2004, in which they asserted an estimated claim in excess of $1.525 million. The Environmental Claim included claims for these amounts:

| | |
|---|---:|
| Removal of Underground Storage Tanks and Piping: | $25,000.00 |
| Cleanup of Environmental Hazards to Property | $500,000.00 |
| Cleanup of Offsite Environmental Contamination | $500,000.00 |
| Depreciation in Value of Property Due to Environmental Hazards | $500,000.00 |
| Claims of Third Parties Arising From Environmental Hazards | Unknown |

All of these amounts were designated as "estimates." By agreement of the parties, the Environmental Claim has been capped at $750,000.[4]

## Burden of Proof

When a party in interest objects to a proof of claim,

> [t]he objecting party has the burden of going forward with evidence supporting the objection. Such evidence must be of probative force equal to that of the allegations contained in the proof of claim. However, an objection raising only legal issues is sufficient. Once the objecting party has reached this threshold, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.[5]

Alternatively, if a proof of claim were executed improperly or is otherwise invalid, the proof of claim loses its *prima facie* validity, and the

---

[4] No evidence was presented to support these estimates. The parties have agreed to postpone determination of the amount of the Environmental Claim pending a ruling on the issue of liability presently before the Court.

[5] *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001) (internal citations omitted). *See also In re Fullmer*, 962 F.2d 1463, 1466 (10th Cir. 1992), *abrogated on other grounds, Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15 (2000); *First Nat'l Bank of Fayetteville v. Circle J Dairy (In re Circle J Dairy)*, 112 B.R. 297, 299 (W.D. Ark. 1989) ("'[A] party correctly filing a proof of claim is deemed to have established a *prima facie* case against the debtor's assets. . . . The objecting party must then produce evidence rebutting the claimant's claim or else the claimant will prevail. If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence. The ultimate burden of proof always rests on the claimant.'") (quoting *Matter of Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988)).

> [creditor] would have the initial burden of proving that a claim exists and the amount of that claim. [The creditor's] failure to do so would require the disallowance of [the] claim. Proof of a claim, on the other hand, would shift the burden to the debtor, as the objecting party, to attack the validity of that claim either based on the law or evidence. The debtor's failure to meet its burden would result in the allowance of [creditor's] claim. But, if the debtor met its burden, [the creditor] would have the ultimate burden to prove the validity and amount of [the] claim.[6]

The Court concludes that the ultimate burden to establish a claim against a debtor's bankruptcy estate lies with the party asserting the claim.

## Conclusions of Law

All of the costs outlined in the Environmental Claim relate to either the cleanup of the Real Property or its diminution in value due to alleged environmental damage. The Creditors Trust takes the position that "the question in this instance is whether [the] Lease Agreement contemplates obligations and liabilities for environmental damages, and, if so, whether the Lease Addendum constitutes a material alteration of the Lease Agreement discharging Hale-Halsell of its obligations under the Guarantee."[7] In response, the Postmas argue that the broad indemnification provisions in the Lease Agreement include liability for environmental damage, and that the Lease Addendum, to the extent it is relevant, did nothing to expand the liability of Hale-Halsell under the Guarantee.

Under the terms of the Lease Agreement, Git-N-Go agreed that it would

---

[6] *In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003). *See also In re Stoecker*, 143 B.R. 879, 883 (N.D. Ill. 1992), *rev'd on other grounds,* 5 F.3d 1022 (7th Cir. 1993) ("[T]he proper procedure for the bankruptcy court is not to disallow the claim if the claimant fails to strictly adhere to the rule; it should merely refuse to consider the proof of claim *prima facie* evidence of the claim's validity and should give the claimant an opportunity to amend or prove its claim."); *Circle J Dairy*, 112 B.R. at 299; *In re Trails End Lodge, Inc.*, 51 B.R. 209, 210 (D. Vt. 1985).

[7] *Brief in Support of Objection to Proof of Claim of Dale and Doris Postma, Docket No. 2040* at 7.

> defend, indemnify and save Lessors harmless from and against all liabilities, obligations, losses, damages and claims, actions, suits and proceedings, charges and expenses, including reasonable attorney's fees, which may be imposed upon or incurred by or asserted against Lessors in respect of any use, non-use or condition of the Leased Premises created by Lessee or attributed to Lessee's use or manner of use of the Leased Premises.[8]

Hale-Halsell guaranteed this obligation. The question is whether this obligation encompasses a duty to repair any environmental damage to the Real Property.

The Creditors Trust argues that the Lease Agreement did not contemplate the assumption by Git-N-Go of any liability for environmental damages for these reasons: (1) the Lease Agreement is silent on the issue of environmental liability; (2) the Lease Agreement required property damage insurance of only $50,000, which would not be sufficient in amount to pay for environmental damage to the Real Property; (3) the Lease Addendum was entered into in order to specifically address the issue of environmental liability; and (4) in the recitals contained in the Lease Addendum, Git-N-Go and the Hoefts stated that the Lease Agreement "was silent as to Lessee's [Git-N-Go's] agreement concerning environmental matters." After thorough consideration, the Court rejects each of these arguments.

While the Lease Agreement does not use the specific term "environmental liability" or anything similar in nature, it is drafted as broadly as possible. Under the Lease Agreement, to the extent Git-N-Go caused damage to the Real Property as a result of its use, Git-N-Go agreed to pay for the damages, and Hale-Halsell guaranteed this obligation. In its most common sense, the word *all* means *all*. The argument regarding property damage insurance is a red herring. Even assuming that general property damage insurance offered protection against environmental claims, the fact that

---

[8] *Stipulation of Facts, Docket No. 2028-2*, Exh. A, ¶ 11.

such insurance was required in a limited amount does not somehow limit the scope of the Guarantee. Surely the Creditors Trust could not claim that the liability of Hale-Halsell for non-environmental property damage under the Guarantee was "capped" at $50,000 based upon the insurance requirements contained in the Lease Agreement.

The most difficult question is raised by the fact that the Lease Addendum contains recitals which would indicate that the issue of environmental liability is being visited for the first time in the Lease Addendum. The Creditors Trust claims that the Lease Addendum constitutes an alteration in the relationship between Git-N-Go and the Hoefts, and thus discharges the obligations of Hale-Halsell as guarantor as a matter of law. The parties and the Court agree that the transactions at issue are governed by Missouri law. Under Missouri law,

> [w]hether an alteration in a guaranty contract is material depends upon whether after the alteration it expresses the same contract, and whether it will have the same operation and effect as before. *Citizens Bank of Smithville v. Lair,* 687 S.W.2d 268, 270 (Mo. App. 1985). A material alteration is one that enlarges or lessens the liability. *Smithville,* at 270. Missouri law is well settled in that a material alteration or departure from the contract without the guarantor's consent will discharge the guarantor. *Smithville*, at 270.[9]

Applying these principles, the question is whether the provisions of the Lease Addendum expanded the obligations of Git-N-Go under the Lease Agreement. The Court concludes that they did not. Under the Lease Agreement, Git-N-Go was obligated to pay for all damages to the Real Property as a result of its use by Git-N-Go. Hale-Halsell guaranteed that obligation. Environmental damages fall within the broad scope of all damages which might be inflicted upon the Real Property. Again, *all* means *all*.

---

[9] *Fuhrer v. Sheahan*, 857 S.W.2d 439, 441 (Mo. Ct. App. 1993). *See also Wigley v. Capital Bank of Sw. Mo.*, 887 S.W.2d 715, 724 (Mo. Ct. App. 1994) (and cases cited therein).

The most persuasive argument advanced by the Creditors Trust is that the Lease Addendum contains language to the effect that environmental damages were not contemplated at the time the Lease Agreement and the Guarantee were executed. That being said, the Court does not conclude that the Lease Addendum expanded Hale-Halsell's liability. Hale-Halsell had already guaranteed the obligation of Git-N-Go to "defend, indemnify and save Lessors harmless from and against *all*" manner of damages which may be incurred as a result of Git-N-Go's use of the Real Property. The Lease Addendum merely spells out in detail how environmental damages were to be identified and remediated. Nothing in the Lease Addendum expanded the duties undertaken by Hale-Halsell—indeed, it would be a difficult task to somehow broaden the duties of Hale-Halsell under the Guarantee, given their initial breadth.

## Conclusion

The terms of the Guarantee were sufficiently broad to encompass liabilities for environmental damage to the Real Property. The Lease Addendum did not expand those obligations. To the extent the Creditors Trust objects to the Environmental Claim upon the basis that the Guarantee did not include environmental claims, and/or that the Lease Addendum altered the obligations of Hale-Halsell under the Guarantee, those objections are overruled. The Court shall enter a separate order scheduling an evidentiary hearing on the amount of the Environmental Claim.

A separate judgment consistent with this memorandum opinion is entered concurrently herewith.

Dated this 11th day of July, 2007.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

4948.4